# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————— )
JANET SCHMIDT,                )
                                     )
        **Plaintiff,**          )
                                       )
           **v.**                )           **Civil Action No. 07-2216 (JMF)**
                                       )
**HILDA SOLIS,**               )
**Secretary of Labor,**      )
                                       )
        **Defendant.**       )
———————————————————— )

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

I conclude that plaintiff has prevailed on her claims for failure to accommodate and for retaliation.  Below are my findings of fact and conclusions of law.

## FINDINGS OF FACT

### Background[1]

1.      From February 1994 to July 2008,[2] plaintiff, Janet L. Schmidt, was employed by the Department of Labor ("DOL") in the Employee Benefits Security Administration ("EBSA"),

---

[1] References to hearing transcripts will be abbreviated to include the date of the proceeding, AM or PM, Tr. and the page number, e.g., "11/09/2011 PM Tr. at 31." Transcripts of the testimony given between 11/07/11 to 11/16/11 are located at [#106-112] for the morning sessions and [#96-101] for the afternoon sessions.

[2] Schmidt applied for and was granted a disability retirement retroactive to July 27, 2008 in January or February of 2010 for disabilities not at issue in this case. 11/09/2011 PM Tr. at 31.

Office of Exemption Determinations ("OED"), as a Pension Law Specialist (GS-12). DEX[3] 1,

18.

2.      Defendant, Hilda Solis,[4] is the Secretary of Labor and is being sued in her official

capacity.  The EBSA is a part of the DOL. Complaint [#1] ¶ 6.

3.      Schmidt was responsible for preparing recommended opinions, letters, and

Federal Register publications, and engaging in conferences with applicants and her managers, in

response to requests for exemptions from the Employee Retirement Income Security Act,

("ERISA").[5] 11/07/2011 AM Tr. at 100-02; DEX 1.

4.      Schmidt suffers from adhesive disease of the pelvis and endometriosis.

11/09/2011 PM Tr. at 4, 7; PEX 1, 9, 11.

5.      Her menstrual cycles are abnormal, painful, and often accompanied by profuse

and uncontrollable bleeding.  Before and during her employment with the DOL, she was losing

bowel control, both within and outside of her menstruation cycle.  Her condition worsened as she

matured. 11/07/2011 AM Tr. at 32-38, 40-62.

6.      Schmidt was first diagnosed with endometriosis in 1994.  At that point, she

underwent the first of what would be four or five different surgeries. 11/07/2011 AM Tr. at 32-

33.

---

[3] DEX refers to Defendant's Exhibit; PEX refers to Plaintiff's exhibit; JEX refers to Joint
Exhibit.
[4] Hilda Solis replaced Elaine Chao as the named defendant on November 2, 2010. [#49].
[5] Pub. L. 93-406, 88 Stat. 829 (Sept. 2, 1974) codified as 29 U.S.C. §§ 1001 *et seq*.  All
references to the U.S. Code are to the electronic versions in Westlaw or LexisNexis.

7.      Schmidt took medication to decrease her pain and manage her condition, although she declined to take certain medications at the time of diagnosis due to the risk of severe, "masculinizing" side effects. 11/07/2011 AM Tr. at 32-33.

8.      As Schmidt's condition progressed, the onset of her symptoms, including severe pain and losing bowel control, could not be predicted in advance. 11/07/2011 at 32-33; PEX 1, 3, 8, 9.

<u>2001</u>

9.      By 2001, Schmidt's condition had progressed to the point where maintaining a regular 40-hour work week at the office was difficult.  On May 15, 2001, Schmidt sent a series of e-mails to her supervisor at DOL, Emmett ("Fil") Williams, indicating her intent to request a flexible work schedule as a reasonable accommodation for her medical condition. PEX 14 at 1-3.

10.     On May 30, 2001, Williams sent Schmidt a letter detailing the information necessary to make a determination on her request, including: 1) "a diagnosis and history of the specific condition;" 2) "the prognosis for the condition;" 3) "the disability and functional impairments necessitating the accommodation;" 4) how the condition "impact[s] on [her] current ability to perform the essential functions (duties) of the job;" 5) "the nature, severity, and duration of [her] impairment;" 6) "the activity or activities [her] impairment limits;" 7) "the extent to which [her] impairment limits [her] ability to perform the activity or activities;" and 8) "the reasonable accommodation which would enable [Schmidt] to perform the functions of [her] job." PEX 14 at 1.

11.     In response to Williams' letter on June 8, 2001, Schmidt's treating gynecologist, Dr. Andre Hall, M.D., submitted a letter to DOL's Public Health Service Medical Consultant,

Dr. Neal Presant, explaining Schmidt's condition and her need to work from home for at least seven months while she underwent a chemical treatment for her condition. PEX 1 at 1; PEX 14 at 3.

12.     Dr. Hall stated that Schmidt suffered from "a case of endometriosis that causes significant and disabling menstrual and non-menstrual pain." PEX 1 at 1.  Dr. Hall indicated that Schmidt's pain was a result both of the worsening endometriosis and the side effects of a medication called leuprolide, which Schmidt was taking to treat her endometriosis. Id.

13.     Dr. Hall stated: "Concerns with commuting to and from her job as well as periods of bed rest during the day make it seem unlikely that [Schmidt] could fulfill the essential elements of her job at the office." PEX 1 at 2.

14.     Dr. Hall also noted that working at home would remove Schmidt's concerns about commuting and permit her to rest periodically, and that if she could work at home, "the likelihood of performing the job[] based on the above statements markedly increases." PEX 1 at 2.

15.     In August 2001, Schmidt submitted a report from Dr. David Zenger, who agreed with Dr. Hall's assessment of Schmidt's health – that she was suffering from a chronic and recurring condition that caused substantial pain. PEX 3 at 1.

16.     Dr. Zenger's report also indicated that Schmidt was being treated with a "chemical injection" used to retard the excessive growth of tissue in the pelvic and abdominal area that could not excised by surgery. PEX 3 at 1.  Dr. Zenger indicated that side effects from this medication include gastrointestinal pain, dizziness, and chest pain "upon physical exertion." Id.  Dr. Zenger then noted that Schmidt clearly suffered from gastrointestinal symptoms and

abdominal pain in the mornings that tended to taper off in the afternoon, as well as dizziness, chest pain, and shortness of breath when walking more than short distances, climbing stairs, and lifting bulky objects. Id. at 2.  Like Dr. Hall, Dr. Zenger recommended that Schmidt work from home five days a week until January 31, 2001, the end of her chemical therapy. Id. at 6.

17.     DOL's medical expert, Dr. Presant, reported that the documents he had reviewed established that Schmidt suffered from a disabling condition, that it appeared impossible for her to come to DOL on any regular, predictable schedule, and that it was "far more likely that she would be able to piece together an eight hour day working from home." PEX 5 at 1.

18.     On August 8, 2001, Williams e-mailed Schmidt, with a copy to James Hampton, senior adviser to EBSA on reasonable accommodation matters, in response to a phone call on August 6, 2001, in which Schmidt expressed concern about the confidentiality of her medical records.  Williams responded:

> [W]hen an employee is concerned about a supervisor reviewing [medical information] either the employee or his/her doctor may forward such medical records directly to the DOL's CRC (attention: Dawn Johnson) with a cover letter explaining the situation and the need for a referral to Dr. Presant of the Public Health Service.  In such instances, neither James Hampton nor I will see these medical records.

PEX 15 at 2-3.

<u>2002</u>

19.     On February 1, 2002, Dr. Richard Tureck, M.D., sent Williams a letter indicating that Schmidt was suffering from "pain with walking and other symptoms which cannot be managed in the office and render her unable to work in the office." PEX 14 at 22.

20.     On February 11, 2002, Dr. Presant sent a letter to Annabelle Lockhart, Director, Directorate of Civil Rights, Office of the Assistant Secretary for Administration and Management, DOL, stating that he had reviewed Schmidt's submissions from her physicians and spoken with Drs. Tureck and Zenger. PEX 14 at 23.

21.     Dr. Presant stated: "Ms. Schmidt is suffering from a disabling condition.  The condition interferes with her ability to commute and to perform her work on a sporadic basis. From a medical point of view, Ms. Schmidt could likely work from home for eight hours a day, but the hours are likely to be sporadic and not within the usual eight hour day." PEX 14 at 23.

22.     Dr. Presant also stated: "Based on the new information, the accommodation request of working from home on an irregular schedule depending on the level of her symptoms appears to be medically reasonable." PEX 14 at 23.

23.     Finally, Dr. Presant stated that Schmidt's "ability to come to the office and to work a regular schedule is impaired." PEX 14 at 23.

24.     On March 12, 2002, Williams granted Schmidt's request for a "five day-a-week flexiplace arrangement as a reasonable accommodation." JEX 1 at 1.

25.     This accommodation stated that DOL would allow Schmidt to work from home under a temporary arrangement, provided that Schmidt was "able to come to the office at least one day a week for a few hours to discuss [her] assignments and attend to any other pending matters which may require [her] physical presence." JEX 1 at 1.

26.     On May 2, 2002, Williams issued an addendum to the March 2002 reasonable accommodation to clarify that Schmidt was not required to come into the office if she was not medically able to do so, and was not required to come into the office once a week every week. JEX 2.

6

27.     On May 16, 2002, Williams issued an additional addendum to the March 2002 reasonable accommodation that clarified that, although the usual flextime plan hours are 6:00 AM to 8:00 PM, Schmidt would be allowed to work after 8:00 PM from Monday to Friday if she notified Williams in advance.  Schmidt would receive regular pay for hours worked Monday to Friday during a regular five day-a-week work schedule and after 8:00 PM.  On days when she was unable to work, Schmidt was to call her OED supervisor to report that she was not working. JEX 3.

28.     Sometime after instituting the 2002 reasonable accommodation, Williams allowed Schmidt to work on the weekends. 11/15/2011 AM Tr. at 27.

29.     Williams also permitted Schmidt to shift hours from one day to the "core hours" of another day on her time sheet.  This was because the time sheet system used by the DOL would "disregard" hours entered outside of the normal work day or grant Schmidt overtime pay for hours put in after 8:00 PM.  Williams allowed Schmidt to shift these hours to ensure that the time system still recognized Schmidt as working "full-time" when medically able, with 80 hours of work per pay period. 11/15/2011 AM Tr. at 28-29.

30.     This arrangement of shifting hours from one evening to the core business hours on other days was approved by James Hampton of the EBSA Human Resources office. 11/15/2011 AM Tr. at 29.

<u>2003</u>

31.     On or around February 3, 2003, Dr. David Katzka, M.D., sent a letter to Williams stating that he had conferred with Drs. Tureck and Schmidt and determined that Schmidt was still suffering from the same symptoms described in earlier correspondence, including abdominal pain related to physical exertion, as described by Dr. Tureck. PEX 6 at 1.

7

32.     Dr. Katzka reiterated that Schmidt needed a "flexible work arrangement due to her condition." PEX 6 at 2.  He also stated that Schmidt's "condition has remained unchanged." Id.  Finally, he indicated that "she has been working from home and this has worked well for her, as she can rest as needed and piece together a forty-hour week." Id.

2004

33.     On February 17, 2004, Williams requested that Schmidt provide updated medical information to support the continuation of the reasonable accommodation within 15 days. JEX 4 at 1-2.

34.     On March 4, 2004, Williams granted Schmidt's request for an extension of the 15-day deadline to April 14, 2004 for providing updated medical information because Dr. Katzka was scheduled to reevaluate Schmidt at the end of the month. JEX 5 at 1.

35.     On March 4, 2004, Williams sent an e-mail to Schmidt, with a copy to Hampton, clarifying the instructions for providing updated medical information.  These instructions indicated that Schmidt and her physician were to decide what continuing accommodations were appropriate "based on the nature and severity of her impairment and other considerations." JEX 5 at 2.

36.     In April of 2004, Eric Raps ("Raps") succeeded Williams as Schmidt's supervisor. 11/14/2011 AM Tr. at 3.

37.     Before Williams left, he and Raps participated in a "hand-off" meeting to bring Raps up to speed about Schmidt.  Williams testified that he and Raps discussed Schmidt's previously submitted medical information to support her request for an accommodation. Williams also informed Raps about his arrangement with Schmidt that she could work on weekends and after 8:00 PM. 11/15/2001 AM Tr. at 40-41.

8

38.     On April 8, 2004, Dr. Katzka, who had become Schmidt's primary physician, wrote a letter addressed to Raps providing the updated medical information requested by Williams in March of 2004. PEX 7 at 1.

39.     On April 13, 2004, Schmidt e-mailed Raps to discuss how Dr. Katzka's letter should be submitted to DOL.  In her e-mail, Schmidt suggested various options for delivery that would protect her privacy, including faxing the letter to a specific machine not open to general office use, or calling ahead to Raps to make sure he was waiting close to the machine to receive the fax before it was sent. PEX 17 at 1.  Schmidt was concerned that faxing the report to a more public machine would create the risk of other DOL employees viewing her confidential medical information. Id.

40.     Sometime between April 13 and April 14, 2004, Schmidt faxed Dr. Katzka's April 8th letter to Raps.  The faxed copy was redacted as to Schmidt's diagnosis and her prescribed medications. PEX 18 at 1; PEX 7, 8.

41.     In an April 14, 2004 e-mail, Schmidt explained that she redacted this information to protect her privacy and because the medications she took were used "to treat other conditions which [she] would not want anyone to think [she had]." PEX 18 at 1.  Schmidt did not want her supervisor or anyone in the office to know specific details about her medical condition, and she expressed concern regarding the people with whom this information would be shared. 11/7/2011 PM Tr. at 58-59, 61, 64; PEX 17; PEX 18.  The letter remained un-redacted as to the general nature of Schmidt's condition.

42.     On April 28, 2004, Schmidt requested, and was granted, annual leave from Raps to visit her mother who was ill with a heart condition. PEX 19; 11/7/2011 PM Tr. at 65-67.

43.    The trip to see her mother in Wisconsin required Schmidt to take a number of precautions, including getting assistance traveling to the airport, using a wheelchair through the airport, and ensuring that she was seated next to the lavatory on the plane. 11/7/2011 PM Tr. at 66-68.

44.    The trip was so painful for Schmidt that she had to remain in bed for several days after the flight.  The only additional travel she did while in Wisconsin was to and from the hospital to visit her mother in the Intensive Care Unit. 11/7/2011 PM Tr. at 69.

45.    On May 12, 2004, Raps issued a memorandum to Schmidt stating that the April 8, 2004 letter from Dr. Katzka did not respond to DOL's request for updated information in a number of material ways. JEX 6 at 1.

46.    Specifically, the memorandum stated that the submitted medical report failed to include 1) the nature and description of Dr. Katzka's examination, 2) the diagnostic procedures performed by Dr. Katzka, 3) the laboratory tests relied upon by Dr. Katzka's for his diagnosis, and 4) Dr. Katzka's prognosis for recovery. JEX 6 at 1-2.

47.    However, Dr. Presant testified that all that was necessary was some sort of report from one of Schmidt's treating physicians stating that her condition was on-going and that she continued to need accommodation. 11/09/11 AM Tr. at 19-23; 11/8/2011 AM Tr. at 52-53.

48.    The memorandum also stated that Dr. Katzka's report should not have been redacted. JEX 6 at 1.

49.    Further, Raps stated that he "reviewed [Schmidt's] time and attendance records for the last 31 pay periods" and found that Schmidt claimed sick leave for only 4% of the number of hours worked and in only 4 of the 31 pay periods.  In light of this, Raps requested that Dr. Katzka reevaluate his statements made in the April 8, 2004 letter to ensure "that his most recent

medical report reflects all relevant information."  Specifically, Raps pointed to Dr. Katzka's statements that Schmidt could no longer engage in activities that required minimal exertion and that she is not well enough to work on some days due to being "incapacitated by pain." JEX 6 at 2.

50.     Raps' memorandum also requested that Dr. Katzka "reevaluate the statements from his report . . . concerning travel restrictions in light of [Schmidt's] recent out-of-town air travel." JEX 6 at 2.

51.     Finally, Raps requested that Dr. Katzka resubmit his medical report under penalty of perjury, "because there may be discrepancies . . . and because documents submitted to the Federal government must be accurate and truthful." JEX 6 at 2.

52.     During trial, Raps testified that he had never heard of the diseases with which Schmidt was diagnosed prior to his becoming Schmidt's supervisor, nor did he understand how those diseases were diagnosed or treated. 11/14/2011 AM Tr. at 47-49, 52-57.

53.     Raps gave Schmidt until June 15, 2004 to submit the revised medical report and stated that, should Schmidt "fail to provide . . . the requested information in a timely manner, such a failure [would] be taken into account in determining [Schmidt's] request for an extension of [her] current temporary accommodation and may result in [her] being required to return to work" at the DOL headquarters building. JEX 6 at 2.

54.     Raps did not submit Dr. Katzka's original, redacted report to the DOL's medical expert, Dr. Presant. 11/14/2011 Tr. at 38-39.

55.     On June 2, 2004 Raps e-mailed Schmidt stating that he had no documentation permitting her to shift hours from one day to another, or to work during the weekend and credit

those hours to days during the week.  Raps requested that Schmidt fax him such written

documentation, if any existed. PEX 14 at 44.

56.     At this point, Schmidt retained counsel, David Colapinto, who wrote to Pamela

Gibbs in the DOL Solicitor's office on June 10, 2004, expressing concern regarding the handling

of Schmidt's accommodation and requesting additional information on the accommodation

process.  Colapinto also requested an extension of the June 15, 2004 response deadline specified

in Raps' memorandum.  JEX 8 at 1-2.

57.     On June 28, 2004, Gibbs replied to Schmidt's attorney, explaining the nature and

basis for Raps' request for additional information, namely, that the commercial airline flight

taken by Schmidt and her attendance records were "inconsistent with the medical conclusions

contained in Dr. Katza's [sic] report." JEX 9 at 1-2.  Gibbs extended the deadline for Schmidt to

submit the medical records to July 9, 2004. JEX 9 at 2.  Lastly, Gibbs stated that, if the requested

information was not received by that date, DOL would be "left with no alternative other than to

deny the continued accommodation and have Ms. Schmidt report to work" at the DOL

Headquarters building. JEX 9 at 2.

58.     On July 12, 2004, DOL gave Schmidt an extension until August 2, 2004 to submit

the additional medical information requested. PEX 14 at 60.

59.     On August 2, 2004, Colapinto sent a letter to Miriam Miller of the Office of the

Solicitor, DOL.  Attached to this letter was an un-redacted copy of the April 8, 2004 letter from

Dr. Katzka. JEX 10.  The letter also expressed Schmidt's continued privacy concerns and

objected to providing Schmidt's "detailed, personal, and highly sensitive medical information to

her supervisors." JEX 10 at 1.  A signed medical release was included with the letter with

instructions that Schmidt's medical information be given only to a Public Health Service doctor for review. Id.

60.     The August 2, 2004 letter also expressed that Schmidt's privacy rights had been violated in the past, when medical information Schmidt submitted to the DOL Leave Bank was improperly disclosed to her supervisors without her consent or knowledge. JEX 10 at 2.

61.     On August 4, 2004, Raps sent Schmidt a letter revoking her reasonable accommodation, stating that because Schmidt had not furnished the requested medical information to him personally by August 2, 2004, there was "insufficient information" for the DOL to make a decision regarding Schmidt's request for the continuance. JEX 11 at 1.  Quoting the July 12, 2004 letter from the DOL Office of the Solicitor to Schmidt's attorneys, Raps reiterated that because he had not received the requested information, Schmidt should have reported to work at the DOL headquarters building on August 3, 2004. Id.

62.     Sometime before August 23, 2004, Miller received sealed packages from Colapinto containing Schmidt's medical records and requesting that the packages be forwarded on to the Public Health Service for review.  On August 23, 2004, Miller sent a letter to back to Colapinto advising that her research "[had] failed to reveal any legal authority that permits the Department of Labor to serve as 'custodian' of sealed packages for the purpose of 'forwarding them' to the Public Health Service' pursuant to a release, without opening or copying them.'" JEX 12.  Accordingly, she stated that she was returning the packages to Schmidt's attorney unopened. Id.

63.     On August 26, 2004, Colpatino spoke by phone with Dawn Johnson of DOL's Civil Rights Center to discuss Raps' request for additional information beyond Dr. Katzka's April 8th report.  Colapinto sent a letter the same day confirming the conversation, noting that

Johnson had agreed to receive the reports prepared by Dr. Katzka and forward them to the Public

Health Service. PEX 22; 11/7/2011 PM Tr. at 83.

64.     On August 30, 2004, Johnson met with Hampton and Gibbs and delivered

Schmidt's medical information to Gibbs. PEX 23.

65.     On September 9, 2004, Schmidt's attorneys hand-delivered a letter to Gibbs, re-

attaching an August 3, 2004 letter from Dr. Katzka previously given to Gibbs by Johnson on

August 31. PEX 24 at 1.  Colapinto once again expressed the personal and sensitive nature of the

information contained therein, and the need to "take every step to safeguard this information in

accordance with the Rehabilitation Act, DOL's policies and procedures, as well as EEOC

guidelines." Id.

66.     In the attached August 3, 2004 letter, Dr. Katzka specified in detail the diagnostic

tests upon which he relied and the surgeries Schmidt had endured.  Dr. Katzka indicated that

Schmidt would "continue to encounter 8-24 hour periods of time when she is so symptomatic

that she is incapacitated . . . [and] her worst days will most likely coincide with menses, due to

abdominal and pelvic swelling in a menstruating female affecting the diseased intestine." PEX 9

at 1.

67.     Dr. Katzka could not provide a "return to work date" and stated that he "cannot

predict if the days that she will be at her worst will occur on weekdays, weekend or holidays."

PEX 9 at 1.  Moreover, Dr. Katzka noted that Schmidt's condition remained serious and that her

routine activities continued to be impaired.  For example, Schmidt could not walk without pain

"because her intestines are encased in diseased tissue . . .  causing pain with movement." PEX 9

at 1-2.

68.     Dr. Katzka concluded that because frequent movement and physical exertion would exacerbate Schmidt's condition, she could not work in a regular office setting.  Dr. Katzka reiterated that Schmidt's symptoms could be managed, however, if she worked at home in a telecommuting arrangement. PEX 9 at 2.

69.     Speaking to the flight Schmidt took to visit her sick mother, he distinguished a 90-minute flight to see an ailing parent "from reporting to work in an office setting with the gastrointestinal symptoms I have described in prior letters." PEX 9.

70.     On September 10, 2004, Raps sent an e-mail to Schmidt, with a copy to Gibbs, reiterating that Schmidt's reasonable accommodation was discontinued because Schmidt failed to provide Raps, directly, with the "necessary medical documentation for my review as requested." PEX 14 at 73.  The e-mail further stated that Raps would not review her status for a reasonable accommodation until Schmidt granted Gibbs a release to turn her medical documentation over to him. PEX 14 at 73.

71.     This forced Schmidt to exhaust all of her leave and request an advance for future leave so she would not go without pay. 11/07/2011 PM Tr. at 75-98; 11/15/2011 Tr. at 61, 69; JEX 11; PEX 14 at 44.

72.     When Raps ended Schmidt's reasonable accommodation, he granted her advanced sick leave through September 9, 2004. PEX 24 at 2; DEX 13; DEX 14.

73.     On September 14, 2004, Raps notified Schmidt via letter that, because he was still not in receipt of her medical information, he was placing her on "absence without leave" (AWOL) until he received the requested medical information. PEX 14 at 74; DEX 16.

74.     Raps continued to demand that the information be submitted to him directly, although that was not required by DOL policy. 11/14/2011 AM Tr. at 44-46.

15

75.     Hampton confirmed that DOL policy did not mandate Schmidt to turn over her records to Raps personally. 11/10/2011 PM Tr. at 14-24; PEX 15.

76.     On September 20, 2004, Schmidt relented and, through her attorney, authorized Gibbs to permit Raps to review the medical documentation that had been sent to Gibbs previously. DEX 17.

77.     On September 21, 2004, after receiving Schmidt's medical information, Raps temporarily reinstated Schmidt's original reasonable accommodation as memorialized in the March 12, 2002 memorandum and May 2, 2002 and May 16, 2002 addendums. PEX 14 at 75. Raps also changed the status of the days Schmidt did not report to the office from September 9, 2004 onward as "leave without pay" instead of AWOL. Id.; 11/14/2011 PM Tr. at 50.

78.     On October 12, 2004, Raps sent a letter to Dr. Presant asking for his medical assistance in reviewing the additional information DOL had received.  Specifically, Raps asked Dr. Present to evaluate whether Schmidt was impaired in her daily activities, whether she could return full or part-time to the DOL office, and how her limitations could be accommodated. JEX 14 at 1; 11/14/2011 PM Tr. at 60.

79.     Raps also asked a series of questions about "inconsistencies" between Dr. Katzka's letters, factual errors in the terms of Schmidt's temporary reasonable accommodation, and "the failure of Dr. Katka [sic] to respond to all of the Department's written questions, as well as Ms. Schmidt's conduct." JEX 14 at 2.  These questions fell under the heading "Request for Review By an Independent Gastroenterologist." Id.

80.     On November 8, 2004, Schmidt received her FY2004 performance evaluation.  In the seven elements of Schmidt's Performance Rating for FY2004 (ending September 30, 2004), Raps rated Schmidt as "meet" (the third highest of four possible ratings) in five elements and

16

"exceed" (the highest rating) in two elements. DEX 18.  Schmidt was awarded a cash bonus for her performance. DEX 21.

81.     On November 24, 2004, Dr. Presant wrote a report to DOL, providing his initial assessment of the medical information provided by Schmidt in response to the questions contained in Raps' October 12 letter. JEX 15.

82.     In response to Raps' first question (whether Schmidt suffered from a documented medical impairment that substantially limited her major life activities and, if so, if she was so impaired that she could not work at home), JEX 14 at 1, Dr. Presant stated that Schmidt "does have a medical history and physical findings to confirm her diagnosis" and that she is in "[c]hronic pain exacerbated by motion" that "would be expected to limit her mobility." JEX 15 at 1.

83.     Further, Dr. Presant stated that "[i]t would be impossible to determine from the medical findings alone whether Ms. Schmidt is so distracted by her pain that she is unable to perform the essential functions of her position.  This would best be determined by the Department of Labor's determination of her work product." JEX 15 at 1.

84.     In response to the next two questions, whether Schmidt could report to the DOL's headquarters and, if not, whether she could report on a part-time basis, Dr. Presant stated that it would be "impossible for [Schmidt] to commute to the Francis Perkins Building on a full-time basis" and that due to the "erratic nature of her pain" her "periods in the building," reporting even on a part time basis "would not be predictable." JEX 15 at 1.

85.     In response to Raps' next question, whether it was medically necessary for Schmidt to work after 8 p.m. for her to work full time, Dr. Presant stated that Schmidt "would be expected to suffer periods of time during which her pain is strong enough to distract her from her

work.  Because these periods might occur during the regular workday, she might need to work irregular hours, conceivably between 8 PM and midnight, in order to complete an eight-hour workday." JEX 15 at 1.

86.     In response to Raps' question of whether traveling on a commercial airplane to visit a sick relative is consistent with Schmidt's reported conditions, Dr. Presant stated that one would expect someone with similar symptoms to "undertake air travel on only a very rare occasion when her level of motivation was extreme, such as visiting an ill parent.  Presumably, she would undergo an extreme degree of pain when she did so." JEX 15 at 2.

87.     On December 16, 2004, Raps, Gibbs, Hampton, Johnson, and Dr. Presant participated in a conference call to discuss Dr. Presant's report on Schmidt. 11/14/2011 AM Tr. at 70-78; [#1] ¶ 23; [#3] ¶ 23.

88.     The conference call consisted of Dr. Presant answering Raps' questions regarding Schmidt's medical condition and Dr. Presant's latest report.  These questions were written by Raps and were submitted in advance to Dr. Presant. PEX 14 at 83; DEX 22.  Raps summarized Dr. Presant's responses in a memorandum for Schmidt's file. Id.

2005

89.     On January 12, 2005, Raps sent Schmidt a letter in which he established a new accommodation for her. JEX 16 at 1.  This memorandum superseded the terms of the reasonable accommodation dated March 12, 2002, and all subsequent amendments and clarifications. Id.

90.     The new accommodation permitted Schmidt to telecommute only up to 25 hours a week, working between 6:00 AM and 8:00 PM Monday through Friday.  For the remainder of the 40-hour work week (15 hours), Schmidt was required to be physically present at the DOL headquarters building sometime between the hours of 6:00 AM and 8:00 PM. JEX 16 at 1.

91.    Raps noted that the new accommodation was "based on all the information received, including a communication with Dr. Presant." JEX 16 at 1.

92.    However, Dr. Presant testified that: 1) he never told Raps in the December 16, 2004 conference call that Schmidt was able to report to the DOL building 15 hours a week, 11/09/2011 AM Tr. at 38-40; 2) in his medical opinion, Schmidt could likely work only "an hour or a little more at a time" in an office setting without lying down or resting, id. at 53; 3) that working 15 hours a week in an office setting was "more than [Schmidt] could reasonably have done at that time," id. at 54; (4) and, indeed, he had no recollection of telling anyone that Schmidt could regularly come to the DOL building even ten hours per week, id. at 48-49.

93.    On January 14, 2005, Schmidt e-mailed Raps requesting that Raps delay implementation of the new accommodation for a period of 60 days. DEX 24.

94.    On January 18, 2005, via e-mail, Raps denied Schmidt's request because no new information had been submitted contradicting "Dr. Presant's assessment that [Schmidt is] able to return to work on a limited basis at the Frances Perkins Building." DEX 26.

95.    On or before January 26, 2005, Schmidt wrote to Raps requesting that the terms of the new accommodation be modified.  See DEX 28 at 1.  Schmidt attached a letter from her gynecologist, Dr. Julius Piver, MD, further detailing Schmidt's symptoms and noting that she would be "unable to maintain a regular schedule of work hours, even a few hours daily, at [the DOL headquarters]." PEX 10; DEX 27.

96.    On February 2, 2005, Raps responded, stating that Dr. Piver's letter was insufficient to change the accommodation, in that it did not contain the type of information requested in Raps' May 12, 2004 memorandum or his predecessor Williams' memo from February 17, 2004. DEX 28 at 1.  Raps also stated that the process for requesting reconsideration

of the January 12, 2005 accommodation "is no different than the process for evaluating the continuation of [her] temporary reasonable accommodation that started in 2004." DEX 28 at 2. Consequently, Raps stated that the terms of the January agreement would remain in effect. Id.

97.     On February 23, 2005, Raps sent a memorandum to Schmidt via e-mail clarifying the type of medical information required for him to consider Schmidt's request to modify the new accommodation. JEX 17 at 1.  Raps noted that the medical report must be "sufficiently detailed" for him to make an informed decision. Id. at 2.

98.     On March 10, 2005, Dr. Piver sent another letter to Ms. Johnson, the Reasonable Accommodation Coordinator, laying out Schmidt's condition, the examinations conducted that lead to Dr. Piver's medical conclusions, and a detailed description of Schmidt's symptoms. DEX 33; PEX 12.

99.     On March 23, 2005, Raps forwarded both of Dr. Piver's letters to Dr. Presant with another series of questions for Dr. Presant to answer. JEX 19; 11/14/2011 AM Tr. at 90.

100.     On April 1, 2005, Dr. Presant issued a written report reiterating that it is up to the DOL to determine whether Schmidt's work product is satisfactory, but according to "the medical documentation, which appears credible and consistent, Ms. Schmidt is unable to work at all at any location other than her house." JEX 20; 11/9/2011 AM Tr. at 29-31.

101.     On April 8, 2005, Dr. Piver sent a fax to DOL stating that Schmidt's condition had been exacerbated "by the profound delay in the handling of her medical accommodation" and requesting its resolution be fast tracked. PEX 13.

102.     On April 13, 2005, there was another teleconference regarding Schmidt's condition and accommodation.  Dr. Presant's hand written notes state that he advised Raps and

others that he would not give any new medical information and Schmidt could possibly "piece together an 8 hr day at more irregular hours." PEX 28.

103.     On April 29, 2005, Raps issued a memorandum to Schmidt setting forth a new reasonable accommodation in response to Dr. Piver's letters that restored many key aspects of the original accommodation.  The new accommodation revoked the January 12, 2005 accommodation, and provided that: 1) Schmidt could work a 40-hour flexiplace work schedule from her home; and 2) she must be available for five hours of work per day, Monday through Friday, between 8:15AM and 4:45PM, in order to interact with Raps and other employees.  The remaining hours could be completed at any time, excluding Federal holidays. DEX 35 at 1-3.

104.     On May 25, 2005, Raps issued a follow-up memorandum addressing additional requests made by Schmidt in response to the new reasonable accommodation.  Raps granted Schmidt's request that the timeframe in which she must be available for interaction with DOL employees be expanded from 8:00 AM to 5:45 PM.  Raps also noted that Schmidt must call him prior to 4:30 PM on any day she planned on working past 7:00 PM, or by 4:30 PM on Fridays when she planned to work over the weekend. JEX 21 at 3-4.

105.     Raps also granted Schmidt's request for a laptop computer to alleviate significant medical problems caused by sitting at a desktop computer and her request for a new secure phone line to conduct her work from home. JEX 21 at 5.

106.     On June 27, 2005, Raps issued a final memorandum concerning Schmidt's accommodation in which he elaborated on the accrual of credit time and revised certain requirements regarding mail and answering the telephone.  Specifically, Raps made it clear that Schmidt could not earn credit hours after 7:00 PM in order to ensure "that [Raps] will be able to

interact with [Schmidt] as much as possible during normal business hours so [Raps] can exercise

the necessary oversight to ensure that the Department's mission is completed." JEX 22 at 1.

Damages

107.     Schmidt testified credibly and in considerable detail regarding her medical

condition and the process she went through to acquire and maintain her accommodation.

Schmidt also described how she invested considerably in her career prior to employment with

DOL, including obtaining an LLM in tax, and continued to report to DOL headquarters for a

number of years prior to requesting any accommodation, despite increasing pain and menstrual

complications. 11/07/2011 AM Tr. at 49-58.

108.     Schmidt also credibly testified that defendant's actions caused her to feel

depressed, anxious, and that she was "mounting a battle rather than doing [her] job." 11/08/2011

PM Tr. at 115.  Schmidt sought the help of a psychiatrist, who prescribed her sleeping pills and

conducted therapy sessions over the phone. 11/08/2011 PM Tr. at 114.

109.     Above all, Schmidt "had an overwhelming fear that if [she] were to lose [her]

position [at DOL] [she] would not have health insurance," and she had been told by "more than

one doctor that [she] would be uninsurable." 11/08/2011 PM Tr. at 115.

110.     Schmidt's financial turmoil was compounded by being placed on leave without

pay status or absent without leave status.  She was also forced to exhaust all her allotted leave.

11/15/2011 PM Tr. at 109-10.

111.     The effect of defendant's actions on Schmidt was heightened by the fact that

DOL, via Raps, required her to turn over confidential gynecological records that contained

private and highly personal information—information that Schmidt felt uncomfortable sharing

22

with her immediate supervisor as a "condition of obtaining an accommodation." 11/08/2011 PM Tr. at 93.

112.     Schmidt testified that she felt "besieged" and so anxious regarding interactions with Raps that sometimes she took a prescription anti-anxiety medication, Xanax, before starting her work. 11/15/2011 PM Tr. at 98, 112.

113.     Schmidt's testimony in these regards and others was fully supported by the testimony of her partner, John Fernstrom.  Fernstrom noted that, under Raps' predecessor, Williams, Schmidt "really loved her work" and did it "with a lot of appetite and good cheer." Overall, he noted, she was a "very positive, happy, outgoing person." 11/07/2011 PM Tr. at 21.

114.     Fernstrom noted that after Raps took over for Williams, Schmidt's relationship with DOL became almost "adversarial," and that Schmidt's focus went from "coming up with a good work product" to "making Mr. Raps happy, whatever that took." Id.

115.     Fernstrom confirmed that Schmidt described Raps' inquiries into her private medical records to be "very intrusive" and anxiety-inducing. 11/07/2011 PM Tr. at 22-23.

116.     Fernstrom's testimony also confirmed that Schmidt was able to work only sporadically, often working "very late" in the evening and on the weekends. 11/07/2011 PM Tr. at 9.

117.     Furthermore, Fernstrom reported that Schmidt appeared at all relevant times to be in considerable chronic pain, especially first thing in the morning, noting that on many occasions she would be "doubled over" in pain. 11/07/2011 PM Tr. at 10.

118.     On the whole, Fernstrom confirmed much of Schmidt's story: that she suffered from loss of bowel control, was in a great amount of unrelenting pain, and needed considerable flexibility to work full time. 11/07/2011 PM Tr. at 9-14, 16-18, 20-21, 40-41.  Fernstrom also

explained that Schmidt's condition limited their ability to engage in social occasions, travel, or go out for a meal. Id. at 40.

## CONCLUSIONS OF LAW

I.      The Rehabilitation Act of 1973

This case arises under the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 791 *et seq*.  In all relevant respects, the Rehabilitation Act specifies that the standards of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112, "shall" be used to determine if it "has been violated." 29 U.S.C. § 794(d).  Consequently, Schmidt's substantive rights are defined by reference to the ADA, as well as the Equal Employment Opportunity Commission's ("EEOC") regulations and enforcement guidance that implement the ADA. 29 C.F.R. § 1630.2; EEOC Enforcement Guidance on Reasonable Accommodation (hereinafter "EEOC Guidance"), available at http://www.eeoc.gov/policy/docs/accommodation.html (last visited Aug. 17, 2012); see also Mogenhan v. Napolitano, 613 F.3d 1162, 1165 (D.C. Cir. 2010).

The ADA provides that no covered employer "shall discriminate against a qualified individual on the basis of disability in regard to . . . [the] terms, conditions, and privileges of employment." 42 U.S.C §12112(a).  The ADA continues by specifying that "the term 'discriminate against a qualified individual on the basis of disability' includes . . . not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C § 12112(b)(5)(A).  Failure to accommodate, therefore, is subsumed under the ADA's definition of discrimination. Id.

For that reason, a plaintiff denied an accommodation need not prove that defendant acted with intent to discriminate or other bad intent.  In that respect, claims under the ADA due to an employer's failure to accommodate are distinct from claims that the employer intentionally

discriminated against the employee on the basis of a disability.  The "D.C. Circuit has stated that it is *not* appropriate to" require proof of intent "when the claim is that the employer failed to provide a reasonable accommodation." <u>Graffius v. Shinseki</u>, 672 F. Supp. 2d 119 at 125, n.8 (D.D.C. 2009) (emphasis in original) (citing <u>Aka v. Wash. Hosp. Ctr.</u>, 156 F.3d 1284, 1288 (D.C.Cir.1998) (<u>en banc</u>); <u>Barth v. Gelb</u>, 2 F.3d 1180, 1187-88 (D.C. Cir. 1993) (cited with approval in <u>Aka</u>).

Rather, the plaintiff must show "(1) that [she] was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of [her] disability; (3) that with reasonable accommodation [she] could perform the essential functions of the position; and (4) that the employer refused to make the accommodation." <u>Graffius</u>, 672 F. Supp. 2d at 125 (citing <u>Scarborough v. Natsios</u>, 190 F. Supp. 2d 5, 19 (D.D.C. 2002)).  In evaluating whether a reasonable accommodation is feasible, "the Court must 'ask simply whether *any* reasonable accommodation would have allowed [the plaintiff] to perform all the essential functions of her job without creating an undue hardship for the agency." <u>Id.</u> (citing <u>Carr v. Reno</u>, 23 F.3d 525, 529 (D.C. Cir. 1994) (emphasis in original)).  "The employee has the burden of identifying reasonable accommodations, and the agency has the burden of showing undue hardship." <u>Id.</u> (citing <u>Chinchillo v. Powell</u>, 236 F. Supp. 2d 18, 23-24 (D.D.C. 2003)).

Schmidt claims that her rights under the Rehabilitation Act were violated throughout the interactive process (Count I); when DOL refused to allow her to continue on a flexible schedule that permitted her to work nights and weekends to make up for time lost during the week (Count II); when DOL revoked her accommodation altogether (Count III); and when DOL issued a new accommodation that required her to report to work in-office 15 hours per week, in contravention of the DOL's own medical expert who did not believe such a requirement was appropriate

(Count IV).  Finally, she claims that she was retaliated against for requesting a reasonable accommodation in the first place (Counts V and VI).  I will address each of these claims in turn.

II.     Interactive Process in 2004-05

Count I of the Complaint alleges that DOL, through Raps, violated the ADA by failing to engage Schmidt in the interactive process concerning her reasonable accommodation.  Complaint [#1] ¶¶ 45-47.  "Employers and employees may need to engage in an 'interactive process' in order to identify and implement a workable accommodation." Mogenhan, 613 F.3d at 1167; Id. at n.4 (citing 29 C.F.R. §1630.2(o)(3)); (quoting and citing, among other authorities, Mayers v. Laborers' Health & Safety Fund of N. Am., 478 F.3d 364, 369 (D.C. Cir. 2007)).   The interactive process requires that employers "make a good-faith effort to seek accommodations." Taylor v. Phoenixville School Dist., 184 F.3d 296, 317 (3rd Cir. 1999).  "An employer who acts in bad faith in the interactive process will be liable if the jury can reasonably conclude that the employee would have been able to perform the job with accommodations." Id.

Schmidt has alleged five distinct periods in which defendant failed to engage in the interactive process in good faith, all of which are actionable under the ADA:

1) May through November of 2004, when defendant refused to transmit Dr. Katzka's redacted report from April 8, 2004 to Dr. Presant;

2) June through September of 2004, when defendant took increasingly severe adverse employment actions because Schmidt refused to turn over her un-redacted medical records directly to Raps;

3) November of 2004, when defendant failed to conclude the accommodation process after receiving the favorable report of Dr. Presant;

4) January of 2005, when defendant refused to transmit the original report of Dr. Piver to

Dr. Presant and re-start the interactive process; and

5) January through June of 2005, the period between defendant's initial denial of Schmidt's requested accommodation and the eventual issuance of the revised accommodation.

A.     May-November 2004

In 2004, when Raps replaced Schmidt's former supervisor, Williams, Schmidt had been successfully operating under the 5 day-a-week flexible workplace reasonable accommodation for two years. Findings of Fact (hereinafter "FOF") at ¶¶ 25-30.  Schmidt's evaluations to this point did not indicate that the reasonable accommodation interfered with her ability to complete her work at a satisfactory level.  Accordingly, Schmidt asserts that Raps' actions during his first few months as her supervisor were unnecessary and unjustified by any business or government purpose.

I agree.  Schmidt's contentions hold weight in three regards: 1) the defendant put forth no compelling justifications for modifying Schmidt's original accommodation; 2) no evidence was offered indicating that the accommodation already in existence impaired DOL's mission in any way; and 3) no sufficient explanation was offered as to why Raps thought it was necessary that he personally review Schmidt's sensitive medical information.

First, Raps was unjustified in his demand for a whole new assessment of Schmidt. Schmidt's original accommodation was based on a review of all the pertinent medical information, submitted to Dr. Presant as requested by Raps' predecessor, Williams. FOF at ¶¶ 11-22.   When Raps took over for Williams, it would have been reasonable to request an update from Schmidt's doctors; indeed, such updates were requested in the past, and Schmidt complied. See FOF at ¶¶ 31-35.  Even Dr. Preasant agreed that Schmidt need only submit an update report from Schmidt's treating physicians to the effect that her condition was on-going and that she

continued to need accommodation. FOF at ¶ 47.  However, when such an update was provided to Raps, he rejected it, saying it was unresponsive to the DOL's request for information. FOF at ¶¶ 45-46.  No compelling rationale was offered for the insufficiency of the April 8th letter or for Raps' need to view an un-redacted version before submitting it to Dr. Presant for review.  There is no way to tell whether or not Dr. Presant would have accepted this letter as satisfactory to continue Schmidt's accommodation, because it was never transferred to him when it was first submitted to Raps.  As such, Raps' actions indicate that he was not willing to participate in the interactive process in good faith; rather, he made unreasonable demands that were not based on any business need.

Second, there were no problems with the flexible work arrangement previously approved by Williams.  For a defendant agency to prevail on an ADA reasonable accommodation claim, it must prove that it would suffer an "undue hardship" as a result of the requested accommodation. The DOL has put forth no evidence to show that the original accommodation resulted in *any* hardship, much less one that is "undue."  During the entire time in question, Schmidt met or exceeded her superiors' requirements as they attested in their performance evaluations of her. FOF at ¶ 80.  There was no indication that Schmidt was incapable of completing her work, provided the accommodation remained in place.

Third, Raps' demand that Schmidt submit highly sensitive and personal medical evaluations to him in un-redacted form was in direct contravention of the EEOC's Enforcement Guidance, which states that an employer cannot ask for documentation when "the individual has already provided the employer with sufficient information to substantiate that s/he has an ADA disability and needs the reasonable accommodation requested."  See EEOC Guidance, available at http://www.eeoc.gov/policy/docs/accommodation.html (last visited Sept. 1, 2012).  There was

no need whatsoever for Raps or any non-physician to see detailed information regarding Schmidt's condition.  By insisting upon seeing it and conditioning any further progress towards arriving at an accommodation upon Schmidt's disclosing the full letter to him, FOF at ¶¶ 53, 61, Raps violated these regulations and unnecessarily inhibited the continuance of Schmidt's reasonable accommodation.  Raps' request was essentially an ultimatum.  The absence of any need for Raps to personally review the un-redacted version of Dr. Katzka's letter is compounded by Raps' own testimony, in which he stated that he had no knowledge of how diseases such as Schmidt's are diagnosed or treated. FOF at ¶ 52.

For all these reasons, the defendant failed to engage in the interactive process in good faith, and the subsequent modifications issued by Raps were unjustified.

B.      June-September 2004

Beginning in June of 2004, DOL subjected Schmidt to increasingly severe adverse employment actions, starting with the revocation of her flexible work at home accommodation that she had been under since 2002.  After Schmidt's accommodation was revoked, Raps informed her that she must come into work at DOL headquarters or she would be forced to take leave without pay.  Schmidt's condition prevented her from coming in, and, as a result, she was forced to exhaust her leave and even future leave in order to mitigate the effects of Raps' actions. FOF at ¶¶ 71-73.  These actions only stopped when Schmidt relented and turned over Dr. Katzka's un-redacted letter directly to Raps. FOF at ¶ 76.   Accordingly, I find that conditioning Schmidt's accommodation on Raps' personal review of her confidential medical records was in violation of the Rehabilitation Act.

Raps insisted on seeing the medical information before passing it on to Dr. Presant even though that was not required by DOL policy, FOF at ¶¶ 74-75, and as just explained, he did not

possess knowledge sufficient to comprehend Dr. Katzka's medical conclusions.  Hampton, a

senior advisor on accommodations, admitted that DOL regulations did not require Schmidt to

turn over her confidential medical records to either him or to her supervisors. FOF at ¶ 75.

Under the ADA, when an employer requests confidential medical information, such

records must be maintained "in separate confidential files and . . . treated as a confidential

record." 42 U.S.C. § 12112(d)(4)(C) (incorporating 42 U.S.C. § 12112(d)(3)(B)-(C) by

reference).  The ADA and the EEOC's regulations both require that employees' medical records

be kept confidential and that supervisors have access only to information necessary to determine

appropriate restrictions on work duties. 42 U.S.C. § 12112(d)(4)(B).  Put another way,

supervisors and managers may only view that which imparts "necessary restrictions on the work

or duties of the employee and necessary accommodations." 42 U.S.C. § 12112(d)(4)(C)

(incorporating 42 U.S.C. § 12112(d)(3)(B)-(C) by reference); 29 C.F.R. § 1630.14(c).  There is

nothing in the ADA or the EEOC regulations mandating disclosure of a specific diagnosis,

medicines prescribed, or other information requested by Raps.

Raps' actions during this time period amount to a failure to engage in the interactive

process, in violation of the Rehabilitation Act.  Indeed, Raps' actions amount to coercion – he

demanded that Schmidt waive the very confidentiality the statute and regulations created before

he would even consider Schmidt's request.

C.     November 2004

On November 24, 2004, Dr. Presant issued his report on Schmidt, indicating in part that

she would not be able to work full time in the office and would need to work irregular hours in

order to fulfill her weekly work requirements. FOF at ¶¶ 81-86.  Dr. Presant stated that Schmidt

remained in need of a reasonable accommodation, and on the basis of this, under the ADA, Raps

should have approved Schmidt's reasonable accommodation for another year.

At that point, the available medical information, Dr. Presant's report, and Schmidt's ability to perform her job throughout the previous accommodation at a satisfactory level indicated that the original accommodation granted to her by Williams was reasonable.  It met her unique needs while permitting DOL to accomplish its mission.  However, for reasons unclear to this Court, Raps remained unsatisfied.  He continued to question Dr. Presant for two additional months about the plausibility of Schmidt's doctors' reports, without any evidence that those doctors were fabricating their medical assessments. FOF at ¶ 78.  The extension of this process also violated the ADA, in that there was no compelling justification for it.  As such, Raps' continued yet unwarranted skepticism of Schmidt and the resulting delay in issuing Schmidt a workable accommodation constituted bad faith with regards to the interactive accommodation process.

D. <u>January-June 2005</u>

On January 12, 2005, Raps reached a conclusion, thus ending the two month delay.  Yet, rather than finding Dr. Katzka's and Dr. Presant's reviews to be satisfactory and approve an extension of the former accommodation, Raps issued a new accommodation that in part required Schmidt to come in to the office for 15 hours every week during the regular workday. FOF at ¶¶ 89-90.  Given that Dr. Presant's report clearly stated Schmidt's inability to predict the time and frequency with which her symptoms would occur, Raps had no basis for this requirement, especially the aspect of it that required Schmidt to report to DOL headquarters during set hours.

Between January and April 2005, Schmidt was forced to work under this new accommodation.  Consequently, she was forced to use up all of her leave, and indeed was placed on leave without pay for failure to report to DOL headquarters for the required hours each week.

It wasn't until the end of April 2005 that the accommodation she had operated under from 2002 to 2004 was restored in its most pertinent parts, namely the five-day flexible arrangement. FOF at ¶ 103.  Thus, the entire process to which Schmidt and the DOL itself were subjected was unnecessary, unjustified, and vindictive, rather being an interactive joint effort to find a reasonable accommodation.

Accordingly, I find that plaintiff has met her burden with regards to Count I, and that the DOL, via Raps, failed to adequately participate in the interactive process.

III.   Revocation of Flexible Schedule

Count II of the Complaint alleges that DOL violated the Rehabilitation Act in June of 2004 when Raps limited Schmidt's reasonable accommodation by no longer allowing her to shift hours between days and to work during weekends for purposes of meeting her required weekly credit hours, as she had been permitted to do by Williams. [#1] ¶¶ 53-55.

On June 2, 2004, Raps emailed Schmidt informing her that there was no record of her being permitted to "shift hours" between days or work on weekends and treat those hours as if they had been worked during the week. FOF at ¶ 55.  This is contrary to other evidence in the record.  Williams, with advice from the Solicitor's Office, had granted Schmidt a reasonable accommodation that included allowing her to work evenings and weekends. FOF at ¶ 30.  This agreement also allowed Schmidt to shift hours between days. FOF at ¶ 29.  Raps knew about this arrangement, as the terms of Schmidt's accommodation were explained to him during a "hand-off" meeting between him and Williams before Williams left his position. FOF at ¶ 37.  Williams testified that he and Raps specifically discussed the after-8:00 PM and weekend arrangement, as well as all the documentation Schmidt previously submitted in support of such an arrangement. Id.

Based on the information Raps had when he took over from Williams, there was no legitimate reason for him to question or limit the terms of Schmidt's reasonable accommodation that had been in place for two years.  His assertion that there was no record of Schmidt being allowed to make up 40 hours by work at night and on weekends is disingenuous.  There was no "record" of her *not* being permitted to work under those conditions.  In any event, Raps was fully aware of the terms of Schmidt's accommodation under Williams, and Raps' pretense–that the allowance of working irregular hours had never been documented and therefore did not exist– was just that, a pretense.  Every physician who explored the matter reached the identical conclusion–Schmidt's pain and inability to control her bowels required her to work at home at irregular hours. FOF at ¶¶ 11-17; 31-32; 66-69; 100; PEX 3 at 1, 5 at 1, 14 at 23, 9 at 1, 10, 12; JEX 15 at 1; DEX 27, 33.  The fact that Raps considered Schmidt's working a flexible work schedule from home to be an open question requiring documentation was unjustified by any evidence, medical or otherwise.  Nor was it justified by any governmental need, given that Schmidt had worked under that arrangement for two years without incident.  I therefore conclude that DOL violated the Rehabilitation Act when Raps limited Schmidt's reasonable accommodation by no longer permitting her to shift her hours between days and work during the weekends.

IV.    <u>Revocation of Plaintiff's Reasonable Accommodation</u>

On August 4, 2004, Raps revoked Schmidt's reasonable accommodation, effective August 2, 2004, for failure to provide updated medical information that would support the continuation of the temporary reasonable accommodation. FOF at ¶ 62.  Count III of the complaint alleges that DOL violated the ADA when it revoked Schmidt's reasonable

accommodation on this date and placed her on AWOL status, later changed to LWOP, through September 20, 2004. [#1] ¶¶ 62-63.

The letter Dr. Katzka prepared in April of 2004 and submitted to Raps in advance of his deadline should have been transmitted to Dr. Presant for review, whether or not it was redacted. Indeed, as I have explained, Raps had no right to see the letter in its entirety in the first place. His revocation of the accommodation was therefore predicated on a requirement by Rap—that he be permitted to see confidential medical information—that violated the regulations pertaining to the receipt and use of that information.  This insistence constituted another violation of the Rehabilitation Act.

V.     Feasibility of New Reasonable Accommodation

Count IV of the complaint alleges that the new accommodation offered on January 25, 2005 was unreasonable because it required Schmidt to work 15 hours per week at the DOL headquarters during "core" work hours. [#1] at ¶¶ 70-71.  Raps' memorandum outlining the new accommodation claimed that its terms were based on Dr. Presant's evaluations and opinions. FOF at ¶ 91.  During trial, however, Dr. Presant denied having ever told Raps that Schmidt was capable of working 15 hours a week in-office. FOF at ¶ 92.  Dr. Presant stated he had no recollection of telling anyone that Schmidt could regularly and predictably report to the office even 10 hours per week. Id.  Dr. Presant, in fact, highlighted the unpredictable nature of Schmidt's condition and noted that she might not be able to work in-office for even an hour and a half at a time without lying down. Id.

Accordingly, there was no reason for DOL to insist upon an accommodation requiring Schmidt to work 15 hours per week in the office during set time periods.  Such a requirement was in fact *unreasonable* according to Dr. Presant's assessment.  As such, the accommodation of

January 25, 2005 was a violation of the Rehabilitation Act because, according to the doctor of

the Public Health Service whose guidance the DOL sought, it was unreasonable in light of

Schmidt's condition.

VI.     Retaliation

        Count V alleges that defendant, in violation of the Rehabilitation Act, retaliated against

Schmidt during the 2004-2005 reasonable accommodation process for her prior protected

activity. [#1] ¶¶ 78-79.

        To prove retaliation, Schmidt must establish three elements: 1) that she was "engaged in

protected activity," 2) that she was "subjected to adverse action by the employer," and 3) that

"there existed a causal link between the adverse action and the protected activity." Smith v.

District of Columbia, 430 F.3d 450, 455 (D.C. Cir. 2005); Mason v. Geithner, 811 F.Supp.2d

128, 179 (D.D.C., 2011) (noting that courts should exclude from consideration actions that "lack

a linkage" to discrimination or retaliation).  If Schmidt can fulfill these elements, the burden

shifts to the defendant to articulate a legitimate non-retaliatory reason for its actions. Smith, 430

F.3d at 455.  If the defendant meets that burden, the sole remaining question is, given the mix of

evidence, could a reasonable juror conclude that defendant's stated reasons for its actions are

insincere and that the real reason is retaliation for protected activity. Id.

        It is clear that requesting a reasonable accommodation for a disability is a protected

activity under the ADA. 42 U.S.C. § 12112(b)(5)(A) (defining discrimination on the basis of

disability to include failures to make reasonable accommodation); Cassimy v. Bd. of Ed., 461

F.3d 932, 938 (7th Cir. 2006), citing with approval Zeigler v. Potter, 641 F. Supp. 2d 25, 29

(D.D.C. 2009); Weigert v. Georgetown Univ., 120 F. Supp. 2d 1, 16 at n.15 (D.D.C. 2000).

Schmidt's retaliation claim is premised on the allegation that Raps' actions, which required

Schmidt to jump through numerous hoops to simply maintain the accommodation she had already been granted, reflected Raps' animus towards her accommodation status.  I find that Schmidt made a sufficient showing in this regard, and thus the burden must shift to DOL to articulate a non-retaliatory reason for its actions–something it cannot do.

I have explained why the justifications tendered for the DOL's actions in this case were not in fact justified by any evidence elicited in support of them.  I have also found that the treatment of Schmidt by Raps was not justified by any deficiency in the medical evidence she provided or in her performance of her duties.  Further, I have found that Raps' reasoning for denying a flexible schedule—that there was no documentation supporting such a schedule–was disingenuous.  I have also just found that Raps' testimony and rationale for ordering Schmidt to work in-office for 15 hours a week–that Dr. Presant indicated such an arrangement would work – was contradicted by Dr. Presant, and I credit the testimony of Dr. Presant.  I therefore find that the justifications provided by the DOL for its treatment of Schmidt to be insincere and find instead that they were motivated by a vindictive desire to retaliate against her for asserting her rights under the Rehabilitation Act.  As such, Schmidt has met her burden on Count V as well.

VI.   Damages

The EEOC guidelines cap compensatory damages for "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses" at $300,000 for defendants with more than 500 employees. 42 U.S.C. § 1981a(b)(3)(D). Additionally, punitive damages are not recoverable from "a government, government agency or political subdivision." 42 U.S.C. § 1981a(b)(1).

I have found that the DOL's violation of the Rehabilitation Act caused intense emotional distress and harm to Schmidt. FOF at ¶¶ 113-118.  While defendant contends that any emotional

distress Schmidt experienced as a result of DOL's actions were mitigated by outside stressors in her life, I find a clear causal link between Raps' behavior during the accommodation process and Schmidt's extreme emotional distress, to which she and her partner testified.  I find that the entire 2004-2005 process took a heavy emotional toll on Schmidt, particularly because of her fear that she would lose her job and the attendant insurance coverage.  Schmidt was forced to seek counseling and take prescription medication to cope with the stress induced by Raps' interrogations.  All of this could and should have been avoided, given that the process culminated in Schmidt's being granted the same accommodation given to her previously– to work irregular hours at home.  It is hard to imagine why so much time was spent fixing something that was not broken.

Schmidt was no angel; at several times her demands for action by DOL by a specific deadline were unreasonable, and she was unquestionably a tough fighter for her rights as she saw them.  That, however, hardly justified the mean-spirited behavior of Raps that was, to be blunt, indefensible and subjected Schmidt, an obviously sick woman, to much unnecessary anxiety, concern, and additional suffering.  I therefore conclude that plaintiff has proven damages sufficient to be awarded at least the statutory maximum of $300,000.

Schmidt brings four claims of failure to accommodate in Counts I to IV.  In the Conclusions of Law she proposes, she asks that, if the Court finds defendants liable on each count, she be awarded $500,000 on each count, subject, however, to the concession that "[t]he actions on which defendant's liability under Count I is predicated are essentially the same acts that supported defendant's liability under Counts II through V." [#94] at 73.  To avoid imposing double damages, Schmidt seeks an award of $2,500,000, which she concedes must be remitted to the statutory cap of $300,000. Id.  Schmidt also requests that the Court find that "the Court's

37

award of damages as to each of Ms. Schmidt's claims would exceed the statutory maximum and so, in the event that some or all of Ms. Schmidt's claims under Count I were to be nullified, she would remain entitled to an award that exceeds the statutory maximum." Id.

Without necessarily accepting whatever theory underlies that request, I can state unequivocally for the purposes of any appellate review that I am convinced that Schmidt has established her entitlement to recovery on each and every count of her complaint and that I would find her entitled to $300,000 on each count, had any of those counts been the only count on which she proceeded to trial. However, since Schmidt is admittedly only entitled to the absolute statutory cap of $300,000, whether the counts are viewed collectively or individually, the question of any impermissible double recovery [6] is avoided.

Schmidt is also entitled to equitable relief in order to place her "as near as may be, in the situation [s]he would have occupied if" violations of the ADA "had not been committed." Albemarle Paper Co. v. Moody, 422 U.S. 405, 418-19 (1975). Back pay is an element of equitable relief that is specifically available to a prevailing plaintiff under the Rehabilitation Act. 42 U.S.C. § 1981a(2) (incorporating 42 U.S.C. § 2000e-5); 29 C.F.R. § 1614.501 (non-discriminatory placement with back pay is an available avenue for relief for plaintiffs prevailing under the Rehabilitation Act).

---

[6] The doctrine of double damages prohibits Schmidt from recovering twice under two theories for the same harm. See Kassman v. Am. Univ., 546 F.2d 1029, 1033 (D.C. Cir. 1976) (quoting Snowden v. D.C. Transit Sys., Inc., 454 F.2d 1047, 1048 (D.C. Cir. 1971)) ("'[I]n the absence of punitive damages a plaintiff can recover no more than the loss actually suffered.'"). "The animating principle is simple: when a plaintiff seeks compensation for wrongs committed against him, he should be made whole for his injuries, not enriched." Medina v. Dist. of Colum., 643 F.3d 323, 326 (D.C. Cir. 2011) (citing Kassman, 546 F.2d at 1033). Thus, a party "'cannot recover the same damages twice, even though the recovery is based on two different theories.'" Id. (quoting Bank One, Tex., N.A. v. Taylor, 970 F.2d 16, 34 (5th Cir. 1992) (additional citation omitted)).

Schmidt asks for a finding that, but for DOL's actions, she would have worked 75 hours per pay period between pay period 14 of 2004 and pay period 19 of 2005. [#94] at 74.  Schmidt also asks for the restoration of all sick and annual leave she would have earned in that period of time. Id.  She concedes that any pay she received in that period and the amount of sick and annual leave she took for reasons unrelated to "defendant's unlawful employment actions" must be subtracted from the amount owed. Id.

On the other hand, DOL insists that 1) Schmidt cannot recover pay for the period of August 2 through September 10, 2004, because she was in fact incapacitated during that period; and 2) she cannot recover for any sick leave that was advanced to her. [#95] at 47-48.  DOL also attacks as duplicative and misleading a chart that Schmidt offered into evidence depicting summaries of time worked and back pay owed. Id. at 48 (referencing PEX 35).

Thus, neither party offered a finding as to the specific amount of back pay that should be awarded to Schmidt if she were to prevail.  Now that she has, I am going to direct counsel for the parties to meet and confer to see if they can arrive at an amount of back pay that should be awarded, with the understanding that by doing so DOL does not concede in any way the validity of the Court's findings of fact or conclusions of law.  If the parties can agree, they should file a joint stipulation of their agreement within 14 days of the date of the Court's issuance of its findings of fact and conclusions of law.  If they cannot agree, they should, within the next 7 days submit a brief statement of their positions as to any back pay owed, specifying the amount of back pay that should be awarded (if any) and the reasons for that award.

At the same time, counsel should discuss a proper award of attorney's fees.  If they can agree, they should file a stipulation of their agreement.  If they cannot, they should file an agreed upon schedule for the filing of a fee petition, opposition, and reply.

**SO ORDERED.**


_____
JOHN M. FACCIOLA
UNITED STATES MAGISTRATE JUDGE